**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Robert E. Blackburn**

Civil Case No. 06-cv-00067-REB-CBS

FLAGSTAR BANK, FSB, a federally-chartered savings bank, and
IMPAC WAREHOUSE LENDING GROUP, INC., a California corporation,

    Plaintiffs,

v.

FIRST COLLATERAL SERVICES, INC., a Delaware corporation,

    Defendant.

**ORDER RE: DEFENDANT'S MOTION TO DISMISS**

**Blackburn, J.**

The matter before me is **First Collateral's Motion to Dismiss Flagstar and Impac's First Amended Complaint** [#19], filed February 14, 2006. I grant the motion with respect to plaintiffs' sole federal claim under the Racketeer Influenced and Corrupt Organization's Act and remand the remaining state law claims to the state district court from which they were removed.

**I. JURISDICTION**

I have jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331 (federal question) and 1367 (supplemental jurisdiction).

**II. STANDARD OF REVIEW**

When ruling on a motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(6), I must determine whether the allegations set forth in the First Amended Complaint, if true, are sufficient to state a claim within the meaning of Fed.R.Civ.P. 8(a). I must accept all

well-pleaded allegations of the First Amended Complaint as true. **McDonald v. Kinder-Morgan, Inc.**, 287 F.3d 992, 997 (10th Cir. 2002).[1] "However, conclusory allegations or legal conclusions masquerading as factual conclusions will not suffice to prevent a motion to dismiss." **Fernandez-Montes v. Allied Pilots Association**, 987 F.2d 278, 284 (5th Cir. 1993); see also **Ruiz v. McDonnell**, 299 F.3d 1173, 1181 (10th Cir. 2002) ("All well-pleaded facts, as distinguished from conclusory allegations, must be taken as true."), *cert. denied*, 123 S.Ct. 1908 (2003). Thus, Rule 12(b)(6) requires dismissal if, taking all well-pleaded facts as true and construing them in the light most favorable to plaintiffs, it is clear that they can prove no set of facts entitling them to relief. **See Conley v. Gibson**, 355 U.S. 41, 45-46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957); **Rocky Mountain Helicopters, Inc., v. Bell Helicopter Textron, Inc.**, 24 F.3d 125, 128 (10th Cir. 1994).

### III. ANALYSIS

In May, 2001, defendant First Collateral Services, Inc. ("First Collateral") extended a $10 million warehouse line of credit to Amerifunding/Amerimax Realty, Inc. ("Amerifunding"). Within a year First Collateral began having problems with "stale" loans on the Amerifunding line.[2] By September, 2002, when such loans accounted for 40 per cent of Amerifunding's outstanding loans, First Collateral declared Amerifunding to be in default.

---

[1] However, I may consider documents referenced in or attached to the complaint and central to plaintiffs' claims without transforming the motion into one for summary judgment. *See* **GFF Corp. v. Associated Wholesale Grocers, Inc.**, 130 F.3d 1381, 1384-85 (10th Cir. 1997).

[2] According to the complaint, "stale" loans are "loans that ha[ve] not be[en] sold to a permanent lender within the time period prescribed by the warehouse agreement." (First Am. Complaint at 8, ¶ 25.)

Soon thereafter First Collateral discovered that $4 million of the stale loans had been repaid, but not by the permanent investor that had originally agreed to purchase them.  In January, 2003, First Collateral's account manager for Amerifunding, Assistant Vice President Bernadette Yee, met with Amerifunding representatives.  At that meeting she learned that Gerald Small, a principal of Amerifunding, was purchasing the stale loans off the First Collateral line using his own funds, selling them to two companies, TDF Funding and Major Mortgage, at market value, and then funneling the proceeds back to Amerifunding.  This constituted a violation of the parties' warehouse agreement, which required the loans to be purchased by an approved permanent lender who had underwritten the loan.  First Collateral later discovered that TDF Funding and Major Mortgage were sham companies set up by Small.

Meanwhile, as specifically provided by the warehouse agreement, First Collateral sent two internal auditors to inspect Amerifunding's property and files.  However, the auditors were stonewalled by Amerifunding representatives, who stated that they were under instructions to refuse to provide the auditors with any information.  Based on Amerifunding's non-cooperation, and the Amerifunding representatives' alleged acknowledgment that the company was engaged in some type of unspecified fraud,[3] the auditors recommended that First Collateral wind down its relationship with Amerifunding as quickly as possible.

The First Amended Complaint alleges that First Collateral thus entered into an agreement with Amerifunding pursuant to which First Collateral would assist

---

[3] Although First Collateral did not know the exact parameters of the fraud at that time, they allegedly learned soon thereafter from Amerifunding "that they were using the warehouse line to finance properties that they were remodeling through affiliated construction companies, and that they were using funds from another investor to transfer the loans off the warehouse line once the loan went stale, and then refinanced the loans back onto the warehouse line." (First Am. Complaint at 12, ¶ 36.)

Amerifunding in securing warehouse lines of credit from other lenders in order to pay off its line of credit with First Collateral. Pursuant to that agreement, when plaintiff Impac Warehouse Lending Group, Inc. ("Impac") made a reference call to First Collateral in May, 2003, in contemplation of extending a line of credit to Amerifunding, First Collateral gave Amerifunding a positive reference. Impac thereafter loaned Amerifunding $10 million.

During the summer of 2003, First Collateral came to realize the full extent of Amerifunding's fraudulent activities. On July 14, 2003, a representative of First Collateral's work out division wrote a memo to senior management confirming that the documentation provided by Amerifunding for the loans was fraudulent, as were the Settlement Agent and Title Company; suggesting that Amerifunding's collateral was "worthless;" and asserting an intent to pursue legal action against Amerifunding and others.

Less than one month later, on August 7, 2003, Yee of First Collateral received a reference call from plaintiff Flagstar Bank, FSB ("Flagstar"). Flagstar, which had already entered into a mortgage warehouse agreement and extended a $5 million line of credit to Amerifunding on April 16, 2003, was considering Amerifunding's request for an increase in the line of credit.[4] Yee allegedly told Flagstar only that First Collateral was winding down its relationship with Amerifunding and had decided not to renew the line of credit because of problems with stale loans. Yee did not inform Flagstar of the full extent of the fraud First Collateral had uncovered at Amerifunding.

---

[4] On April 25, 2003, Flagstar and First Collateral entered into an Intercreditor Agreement establishing priorities between them with respect to their respective loans to Amerifunding.

The following month, Amerifunding paid off the outstanding balance on its line of credit with First Collateral. In November, 2003, Flagstar increased Amerifunding's warehouse line to $20 million. In March, 2004, Flagstar had become sufficiently suspicious of Amerifunding that it recontacted Yee, who then allegedly revealed that First Collateral had been aware of Amerifunding's activities. This lawsuit followed.[5]

Plaintiffs originally filed suit in the District Court of Denver County, Colorado, alleging causes of action for fraudulent misrepresentation and non-disclosure, aiding and abetting fraud, conspiracy, violation of the Colorado Organized Crime Control Act ("COCCA") and the Racketeer Influenced and Corrupt Organizations Act ("RICO"), negligent misrepresentation, unjust enrichment, and breach of contract. After the case was removed, plaintiffs amended their complaint to add claims of conversion, constructive trust, and civil theft. First Collateral now seeks to dismiss all causes of action asserted in the First Amended Complaint for failure to state claims on which relief may be granted. Because my jurisdiction in this matter is predicated on the lone federal claim alleging a violation of the RICO statute[6] (*see* Notice of Removal at 2, ¶¶ 4-6), I will address it first.

Although plaintiffs do not specifically state under which of the four subsections of 18 U.S.C. § 1962 their RICO claims arise, it appears from their response to the motion to dismiss that they construe their claims as implicating section 1962(c), which provides, in relevant part:

---

[5] Both Small and another Amerifunding principal, Chad Heinrich, were charged criminally. Small pleaded guilty to charges of federal bank fraud and wire fraud in October, 2005. Heinrich also pleaded guilty in connection with these events and was ordered to pay restitution to Flagstar and Impac, but they so far have received only a fraction of the ordered restitution amount.

[6] This claim as set forth in the First Amended Complaint is raised by Flagstar only.

5

> (c) It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity . . .

18 U.S.C. §§ 1962(c).[7] To state a RICO claim under section 1962(c), plaintiffs must allege that First Collateral participated in the conduct of an "enterprise" through a "pattern" of "racketeering activity." **Garrett v. Selby Connor Maddux & Janer**, 425 F.3d 836, 838 (10th Cir. 2005.)  A defendant engages in "racketeering activity" when it commits one or more RICO "predicate acts," that is, the various federal and state crimes specified in 18 U.S.C. § 1961(1). **United States v. Smith**, 413 F.3d 1253, 1268-69 (10th Cir. 2005), **cert. denied**, 126 S.Ct. 1093 (2006). To show a "pattern" of such activity, plaintiffs must establish that First Collateral committed at least two predicate offenses, which are both related to one another and demonstrate a threat of continuing activity. **H.J., Inc. v. Northwestern Bell Telephone Co.**, 492 U.S. 229, 236-37, 239, 109 S.Ct. 2893, 2899, 2900, 106 L.Ed.2d 195 (1989); **Resolution Trust Corp. v. Stone**, 998 F.2d 1534, 1543 (10th Cir. 1993).

"'Continuity' is both a closed- and open-ended concept: closed-ended referring to a closed period of repeated conduct and open-ended referring to conduct that by its nature projects into the future with a threat of repetition." **Stone**, 998 F.2d at 1543. Because it is clear that plaintiffs do not allege a threat of future conduct, they may meet

---

[7] Plaintiffs further argue in a footnote that their complaint can be construed to state a claim under section 1962(d), which prohibits any conspiracy to violate the substantive provisions of sections 1962(a), (b), and (c).  I generally do not consider such inadequately briefed arguments.  **See Wal-Mart Stores, Inc. v. Adler**, 144 F.3d 664, 679 (10th Cir. 1998). Nevertheless, even if I were to entertain this argument, plaintiffs' failure to adequately plead a violation of a substantive RICO provision would bar their claim under section 1962(d) in any even. **See Schroder v. Volcker**, 864 F.2d 97, 98 (10th Cir. 1988); **Kaplan v. Reed**, 28 F.Supp.2d 1191, 1197 (D. Colo. 1998).

their burden of pleading continuity by alleging criminal activity over a substantial period of time. **H.J., Inc.**, 109 S.Ct. at 2902; **Brooks v. Bank of Boulder**, 891 F.Supp. 1469, 1478 (D. Colo. 1995). "Predicate acts extending over a few weeks or months and threatening no future conduct do not satisfy this [requirement]: Congress was concerned in RICO with long-term criminal conduct. [Six to seven months] is not a long enough period to state a close-ended RICO claim." **Brooks**, 891 F.Supp. at 1478 (citations and internal quotation marks omitted; second alteration in original). **See also Alter v. DBLKM, Inc.**, 840 F.Supp. 799, 809 (D. Colo. 1993) (period of one year or less does not constitute a substantial period of time for purposes of RICO continuity requirement).

Assuming *arguendo* that plaintiffs have adequately pleaded a sufficient number of predicate acts, they do not show that the alleged pattern of such acts extended over a period of time substantial enough to implicate the RICO statute. At best, First Collateral's relevant conduct commenced on August 7, 2003, when Yee gave the allegedly misleading reference to Flagstar,[8] and ended in March, 2004, when Yee finally acknowledged First Collateral's awareness of Amerifunding's fraudulent activities. This seven- to eight-month period is insufficient to plead a claim under RICO. Accordingly, the motion to dismiss as to that claim should be granted.

---

[8] Plaintiffs' attempt to date the commencement of the period any earlier must fail. Prior to the time Yee gave the allegedly misleading reference, First Collateral had no duty to disclose what it knew about Amerifunding to Flagstar. **See B.E.L.T., Inc. v. Wachovia Corp.**, 403 F.3d 474, 476-77 (7th Cir. 2005); **In re: Sharp International Corp.**, 403 F.3d 43, 51-52 & n.2 (2nd Cir. 2005); **Liberty Savings Bank, FSB v. Webb Crane Service, Inc.**, 2005 WL 1799300 at *3-5 (D. Colo. July 27, 2005); **Van Winkle v. Transamerica Title Insurance Co.**, 697 P.2d 784, 786-87 (Colo. App. 1984). Even if I were to consider plaintiffs' arguments in this regard, they have alleged a period of only 13 months, which I find insufficient on the facts of this case to establish the requisite continuity. **See Stone**, 998 F.2d at 1544 (noting that court should analyze continuity "with the goal of achieving a natural and commonsense result") (citation and internal quotation marks omitted).

The RICO claim constitutes the sole federal claim in this lawsuit. When all federal claims have been dismissed prior to trial, the court generally should decline to exercise supplemental jurisdiction over pendant state claims. ***United States v. Botefuhr***, 309 F.3d 1263, 1273 (10th Cir. 2002). I note that it appears from the allegations of the First Amended Complaint that federal diversity jurisdiction also might provide a basis for federal subject matter jurisdiction in this case. Nevertheless, First Collateral did not remove on that basis, but rather asserted only that removal was proper because the case presented a federal question. (*See* Notice of Removal at 2, ¶¶ 4-6.)

This omission is not rectifiable by amendment. Although a removing party may freely amend its notice of removal within the thirty-day period prescribed by 28 U.S.C. § 1446(b), once that period has expired, as it has here, the removal notice may only be amended pursuant to 28 U.S.C. § 1653. ***Energy Catering Services, Inc. v. Burrow***, 911 F.Supp. 221, 222-23 (E.D. La. 1995). Section 1653, in turn, permits amendment only to correct "technical" defects in the jurisdictional allegations of the removal notice, but does not allow a party to remedy substantive defects, such as the failure entirely to plead a basis for federal jurisdiction. *See **Agrico Chemical Co. v. The Williams Companies, Inc.***, 2005 WL 2044942 at *7 n.6 (N.D. Fla. Aug. 23, 2005); ***Blakeley v. United Cable System***, 105 F.Supp.2d 574, 578-79 (S.D. Miss. 2000) (citing cases); ***American Educators Financial Corp. v. Bennett***, 928 F.Supp. 1113, 1115 (M.D. Ala. 1996); ***Energy Catering Services***, 911 F.Supp. at 223. The rule is succinctly summed up by Wright and Miller:

> The notice of removal required by Section 1446(b) may be amended freely by the defendant prior to the expiration of the thirty-day period for seeking removal . . . Thereafter,

8

> however, the cases indicate that the notice may be amended only to set out more specifically the grounds for removal that already have been stated, albeit imperfectly, in the original notice. . . [T]he amendment of the removal notice may seek to accomplish one or more of several objectives: it may correct an imperfect statement of citizenship, or state the previously articulated grounds more fully, or correct the jurisdictional amount. Completely new grounds for removal jurisdiction may not be added and missing allegations may not be furnished, however.

14A CHARLES A. WRIGHT, ARTHUR R. MILLER & EDWARD H. COOPER, FEDERAL PRACTICE AND PROCEDURE § 3733 at 358-61 (1998 ed.) (footnotes omitted). For these reasons, I find it appropriate to adhere to the generally accepted practice and remand the state law claims.

**THEREFORE, IT IS ORDERED** as follows:

1. That **First Collateral's Motion to Dismiss Flagstar and Impac's First Amended Complaint** [#19], filed February 14, 2006, is **GRANTED IN PART**;

2. That the motion is **GRANTED** with respect to the Fifth Claim for Relief of the First Amended Complaint, asserting violations of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962, and that RICO claim is **DISMISSED WITH PREJUDICE**;

3. That judgment **SHALL ENTER** on behalf of defendant, First Collateral Services, Inc., and against plaintiff, Flagstar Bank FSB, with respect to the Fifth Claim for Relief of the First Amended Complaint, asserting violations of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962;

4. That this case is **REMANDED** to the District Court of Denver County, Colorado, from which it was removed.

Dated April 18, 2006, at Denver, Colorado.

**BY THE COURT:**

**s/ Robert E. Blackburn**
**Robert E. Blackburn**
**United States District Court**